STATE OF CONNECTICUT *v.* HARVEY FRITZ
(12636)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and MORAGHAN, Js.

---

Argued April 8—decision released June 23, 1987

*Shelley R. Sadin,* with whom was *Jacob D. Zeldes,* for the appellant (defendant).

*Robert J. Murphy,* special deputy assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Julia DiCocco Dewey* and *Thomas V. O'Keefe, Jr.,* assistant state's attorneys, for the appellee (state).

CALLAHAN, J. The dispositive issue in this appeal is whether the trial court erred in restricting the scope of questioning during the voir dire examination of the potential jurors. By substitute information, the defendant, Harvey Fritz, a licensed physician specializing in internal medicine and cardiology, was charged with prescribing a controlled substance to another person in a manner not authorized by chapter 417 of the General Statutes, in violation of General Statutes §§ 21a-277 (a)[1] and

[1] "[General Statutes] Sec. 21a-277. (Formerly Sec. 19-480). PENALTY FOR ILLEGAL MANUFACTURE, DISTRIBUTION, SALE, PRESCRIPTION, DISPENS-

21a-252 (a)[2] (formerly chapter 359, General Statutes §§ 19-480 [a] and 19-460 [a]). Following a trial to a jury, the defendant was found guilty, and was subsequently fined $3000 and sentenced to a term of imprisonment of four years, execution of such sentence suspended after nine months. He was placed on probation for a period of five years, and ordered not to carry on any activities that require a license to dispense narcotics or to practice medicine or surgery. After the court rendered judgment, the defendant took this appeal.

The relevant facts are as follows: In 1968, the defendant began treating Barbara Gorman, the patient for whom he was accused of illegally prescribing medication. Gorman was under the care and treatment of the defendant for approximately thirteen years, and during that time had numerous medical problems. As a result of a 1975 injury to her back, Gorman developed chronic back pain. She underwent a series of unsuccessful operations in an attempt to alleviate her pain and finally, in 1977, the defendant began prescribing Demerol, a narcotic, to ease the pain emanating from

ING. (a) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marihuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned."

[2] "[General Statutes] Sec. 21a-252. (Formerly Sec. 19-460). PRESCRIPTION AND DISPENSING OF CONTROLLED SUBSTANCES BY CERTAIN PRACTITIONERS. SURRENDER OF UNUSED SUBSTANCES BY PATIENTS. (a) A physician, in good faith and in the course of his professional practice only, may prescribe, administer and dispense controlled substances or he may cause the same to be administered by a physician assistant, nurse or intern under his direction and supervision, for demonstrable physical or mental disorders but not for drug dependence except in accordance with state and federal laws and regulations adopted thereunder."

her back. The Demerol was prescribed in liquid form and taken by intramuscular injection. From 1978 to 1981, the dosage and frequency of Demerol prescribed for Gorman increased steadily. She was also consuming a number of other medications for various medical conditions.

In the spring of 1981, the defendant referred Gorman to a pain specialist, Arthur Taub. Because of the potential for addiction and overdose associated with Demerol, Taub discontinued Demerol, and prescribed Methadone. Taub also contacted the defendant and requested that he discontinue prescribing Demerol for Gorman. For the next few months, Gorman remained on medication prescribed by Taub, without any prescriptions for Demerol from the defendant. On July 10 and 16, 1981, apparently after Gorman had run out of her Methadone prescription, the defendant prescribed two grams of Demerol for her. On both dates, Taub was available to prescribe Methadone but, for whatever reason, was not contacted. Gorman died in an automobile accident on July 17, 1981. Autopsy results indicated that the amount of Demerol in her blood was ten times the normal therapeutic level.

On appeal, the defendant claims that the trial court erred in: (1) restricting the voir dire examination of the prospective jurors; (2) admitting irrelevant testimony concerning the circumstances of Gorman's death and the investigation of the accident in which she was killed; (3) shifting to the defendant the burden of proof on the issue of whether the defendant had acted in good faith and in the course of his professional practice; and (4) denying the defendant's motion to dismiss the information which he based on collateral estoppel. We find error on the defendant's first claim and on part of his second claim, and therefore remand the case for a new trial.

## I

During the voir dire, defense counsel sought to question the first and second members of the venire to determine whether they believed that the testimony of a police officer or a law enforcement person is entitled to more weight or credibility than that of any other person simply because of their status. The court refused to allow this line of questioning. The trial court, noting the defense counsel's exceptions, stated that if similar questions were asked of future venire members his rulings would be the same. The defendant claims that the trial court violated his constitutional right to conduct a voir dire examination of prospective jurors by restricting his questioning on this issue. We agree.

Section 19 of article first of the Connecticut constitution, as amended by article IV,[3] states in pertinent part: "In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law." In addition, General Statutes § 54-82f[4] provides the right to a voir dire examination

---

[3] Section 19 of article first of the Connecticut constitution, as amended by article IV provides: "Section 19 of article first of the constitution is amended to read as follows: The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate."

[4] "[General Statutes] Sec. 54-82f. VOIR DIRE EXAMINATION. In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto. If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge

of each prospective juror in a criminal action. It is firmly established therefore that "[t]he right to question each juror individually by counsel shall be inviolate." See, e.g., *State* v. *Dolphin,* 203 Conn. 506, 511, 525 A.2d 509 (1987); *Lamb* v. *Burns,* 202 Conn. 158, 162, 520 A.2d 523 (1987); *State* v. *Hill,* 196 Conn. 667, 671–72, 495 A.2d 699 (1985). The extent of the voir dire examination rests largely within the discretion of the trial court, and the exercise of such discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted. *State* v. *Dolphin,* supra; *State* v. *Rogers,* 197 Conn. 314, 318, 497 A.2d 387 (1985); *State* v. *Haskins,* 188 Conn. 432, 447, 450 A.2d 828 (1982); *State* v. *Anthony,* 172 Conn. 172, 175, 374 A.2d 156 (1976); cf. *State* v. *Smith,* 10 Conn. App. 624, 638, 525 A.2d 116 (1987). Nevertheless, in exercising its discretion, the court should grant such latitude as is reasonably necessary to accomplish the twofold purpose of voir dire: to permit the trial court to determine whether a prospective juror is qualified to serve, and to aid the parties in exercising their right to peremptory challenges. *State* v. *Rogers,* supra; *State* v. *Haskins,* supra, 446. Therefore, " 'if there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case.' " *State* v. *Rogers,* supra, 318.

We have recently had the opportunity to address the issue of whether the restriction of questions to prospective jurors concerning their possible predisposition to give additional weight to a police officer's testimony

determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of said action."

solely because of his official status constitutes reversible error. See *State* v. *Dolphin,* supra; *State* v. *Rogers,* supra; *State* v. *Hill,* supra. In *State* v. *Dolphin,* supra, 515, we held that "[t]he police officers' testimony was crucial in establishing the state's case . . . the defendant had the right to attempt to ascertain whether a juror might be more, or less, inclined to credit their testimony solely because of their official status." See also *State* v. *Rogers,* supra; *State* v. *Hill,* supra.

The state argues that the holdings in *Hill* and *Rogers* do not stand for the proposition that a trial court's refusal to allow a particular question during voir dire is reversible error per se. Rather, the state contends that we must assess the claim of error in the context of the entire voir dire to determine whether the defendant was afforded a sufficient opportunity to expose juror bias or prejudice in general. It argues that an examination of the entire voir dire may reveal extensive questioning concerning juror bias and partiality and whether potential jurors were acquainted with or related to law enforcement officials, and that such questioning would provide a sufficient basis for this court to determine that the means employed to test juror impartiality created a reasonable assurance that prejudice would have been discovered if present.[5] We agree that *Hill, Rogers,* and more recently, *Dolphin,* do not establish a per se error standard for the disallowance of a particular question during voir dire. Although we agree with the state's contention that we must examine the defendant's claim of error in the context of the entire voir dire, we are not persuaded that the erroneous ruling was harmless.

[5] The state also claims in its brief that the defendant's claim is not reviewable because he failed to provide the transcript of the entire voir dire. On November 26, 1986, we granted the defendant's motion to supplement the record by filing an additional portion of the transcript and, therefore, the entire transcript of the voir dire is part of the record on appeal.

We stated in *State* v. *Hill,* supra, 672–73, that "[w]hen important testimony is *anticipated* from certain witnesses whose official or semi-official status is such that a juror might reasonably be more, or less, inclined to credit their testimony, a query as to whether a juror would have such an inclination should be permitted. . . . It was of vital importance to the defendant that if any such inclination existed it be brought to light. [A defendant is] entitled to explore this area of possible disqualification prior to the impaneling of the jury. Only then could he intelligently challenge for cause or exercise his right of peremptory challenge. *State* v. *Higgs,* [143 Conn. 138, 144, 120 A.2d 152 (1956)]." (Emphasis added; citations omitted.) From this perspective, we conclude that general questions during voir dire concerning a juror's bias and impartiality and his relationships to law enforcement officials, would not necessarily expose whether a juror has a tendency to believe or disbelieve or give more weight to such officials because they are persons of authority, or enable the defendant to exercise intelligently his right of peremptory challenge.

The state also contends that unlike the situation in *State* v. *Hill,* supra, the state's case-in-chief in this matter rested primarily on the testimony of physicians, members of the defendant's profession, not that of law enforcement officials. Consequently, the state argues that any questions of prospective jurors on voir dire concerning any possible predisposition to believe law enforcement officials because of their status were of minimal importance, and their exclusion should not result in reversal. We disagree.

In this case, six of the state's fourteen witnesses were either police officers or persons working for the state in an investigative capacity,[6] and the majority of them

---

[6] The fact that not all of the witnesses in question were police officers, but that some were investigative officers for the state, does not affect our

provided testimony crucial to the state's case against the defendant. Under General Statutes § 21a-252 (a), "[a] physician, in good faith and in the course of his professional practice only, may prescribe, administer and dispense controlled substances . . . for demonstrable physical or mental disorders but not for drug dependence . . . ." In order to show the defendant's lack of good faith in prescribing the controlled substance Demerol, the state presented the testimony of Richard Moore, Jr., a drug agent for the state of Connecticut, who had investigated the defendant's practices. He testified that he had obtained, from local pharmacies in Meriden, prescriptions the defendant had written for Gorman during the time period in question. He stated that, in his years of experience as a drug agent, he had never seen prescriptions of Demerol written with such frequency. This testimony was countered by the defendant's expert witness, Forest Tennant, a pain specialist, who testified that when treating someone with chronic back pain, there is no set "upper limit" with respect to the amount or frequency of the drug being prescribed. Moore also testified that he had seized Gorman's medical file from the defendant's office, pursuant to a search warrant. He stated that the defendant had failed to make any notations in Gorman's medical file concerning either her office visits during 1980 and 1981, or the prescriptions written for her during that period. Although the defendant did not introduce any extrinsic evidence to impeach this testimony, he did testify that he had, in fact, made such notations in Gorman's file and that his office records must have been altered. The state then introduced rebuttal testimony from Thomas O'Grady, an investigator for the Connect-

---

discussion of this claim. In *State* v. *Hill,* 196 Conn. 667, 495 A.2d 699 (1985), the focus of our review was on whether important testimony was anticipated from witnesses with "official" or "semi-official" status. Certainly, investigative officers employed by the state would fit into either of these categories.

icut state department of health services, who testified that the file in question had been in his custody and had not been altered. The testimony of these state's witnesses, if believed, would support an inference that the defendant had not acted in good faith or in the proper course of his professional practice in prescribing Demerol to Gorman.

The state also presented the testimony of Richard Pinder, a physician and the director of the toxicology department of the office of chief medical examiner for the state of Connecticut. Pinder testified that the blood tests he had conducted on Gorman's body revealed the presence of Demerol and two antidepressant drugs, and that the amount of Demerol in her system was ten times the normal therapeutic level. In addition, he opined that because of the high level of the drug, Gorman must have been exhibiting toxic effects from the Demerol. Thereafter, a former Meriden police officer testified that while he was on the police force in Meriden he had observed Gorman walking through a parking lot appearing dazed and confused, thereby bolstering the testimony that Gorman was exhibiting toxic effects from the drug. Although this testimony was contradicted by testimony from the defendant, and from the defendant's expert witness, it would have supported an inference of guilt if believed by the jury.[7]

We conclude, therefore, that testimony from state officials and police officers was crucial in establishing the state's case, and therefore, the defendant had the right to inquire as to whether a juror might be more, or less, inclined to credit their testimony solely because

[7] The state also introduced testimony from a document analyst for the United States postal service, and a former document examiner for the state of Connecticut police crime laboratory. These witnesses identified the defendant's signatures on the prescriptions for Gorman. In addition, another Meriden police officer testified with respect to his investigation at the scene of the car accident in which Gorman was killed.

of their official status. As we have previously held, "[n]othing could be plainer than that a predisposition to attach greater or less credence to a witness' testimony simply because of that witness' position as an officer [or because of official status] is inconsistent with the defendant's constitutional and statutory right to an impartial jury. The denial of such a fundamental right cannot be countenanced." *State* v. *Hill*, supra, 673; see also *State* v. *Dolphin*, supra, 516; *State* v. *Rogers*, supra, 319. The trial court's refusal in this case to allow questioning concerning any predisposition was therefore an abuse of discretion. Accordingly, we find error and order a new trial.

Although our holding is dispositive of this appeal, we will consider certain of the defendant's other claims of error which are likely to arise upon retrial.

During the course of voir dire, defense counsel sought to question a prospective juror concerning burden of proof, reasonable doubt, and the presumption of innocence. The trial court disallowed these questions and the defendant excepted. The defendant claims that it was an abuse of discretion for the trial court to disallow all questions during voir dire pertaining to these subjects. He argues that such inquiries could expose the inability of prospective jurors to perform the functions required of a juror in a criminal case and hence were crucial. We disagree.

A juror's knowledge or ignorance concerning questions of law are generally not a proper subject of inquiry on voir dire. Such questions are concerned with matters which the juror is bound to take from the court. *State* v. *Dahlgren*, 200 Conn. 586, 601, 512 A.2d 906 (1986); *State* v. *Clark*, 164 Conn. 224, 226, 319 A.2d 398 (1973); *Duffy* v. *Carroll*, 137 Conn. 51, 56–57, 75 A.2d 33 (1950). The presumption of innocence and the state's burden of proof beyond a reasonable doubt are

legal principles which the trial court, in this case, discussed in detail in both its preliminary and final charge to the jury. Since it is presumed that an impartial juror will follow the trial court's instructions; *Francis* v. *Franklin,* 471 U.S. 307, 324–25 n.9, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985); *Connecticut* v. *Johnson,* 460 U.S. 73, 85 n.14, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983); *State* v. *Dahlgren,* supra, 603; *State* v. *Washington,* 182 Conn. 419, 429, 438 A.2d 1144 (1980); we cannot conclude that the trial court abused its discretion in disallowing these questions. Cf. *United States* v. *Price,* 577 F.2d 1356, 1366 (9th Cir. 1978); *United States* v. *Ledee,* 549 F.2d 990, 993 (5th Cir. 1977); *United States* v. *Wooton,* 518 F.2d 943, 946 (3d Cir. 1975); *People* v. *Swain,* 43 Colo. App. 343, 346–47, 607 P.2d 396 (1979); *McCulligh* v. *State,* 169 Ga. App. 717, 721–22, 314 S.E.2d 724 (1984).

## II

The defendant also contends that the trial court erred in admitting irrelevant and prejudicial testimony concerning the circumstances of Gorman's death, and the investigation of the accident in which she was killed. Specifically, the trial court admitted into evidence, over the defendant's objection, details of the automobile accident in which she was killed, certain items found at the accident scene, and the results of the autopsy performed on Gorman's body, which indicated the presence of high dosages of controlled substances in her bloodstream.

At the outset, we note that trial courts have broad discretion in determining the relevancy of evidence. *State* v. *Boucino,* 199 Conn. 207, 225, 506 A.2d 125 (1986); *State* v. *Sharpe,* 195 Conn. 651, 658–59, 491 A.2d 345 (1985); *State* v. *Piskorski,* 177 Conn. 677, 695, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). Rulings on such matters

will be disturbed on appeal only upon a showing of a clear abuse of discretion. *State* v. *Boucino,* supra; *State* v. *Falcon,* 196 Conn. 557, 566, 494 A.2d 1190 (1985). We have consistently held that "evidence is relevant only when it tends to establish the existence of a material fact or to corroborate other direct evidence in the case. *State* v. *Sharpe,* [supra, 659]; *State* v. *Mastropetre,* 175 Conn. 512, 517, 400 A.2d 276 (1978)." *State* v. *Talton,* 197 Conn. 280, 285, 497 A.2d 35 (1985). " 'No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience.' " *State* v. *Sharpe,* supra, 659.

The evidence concerning the results of the autopsy performed on Gorman, introduced through the testimony of the state's witness, Richard Pinder, a forensic toxicologist, logically tended to support the state's contention with respect to the amount of Demerol that was being prescribed to Gorman by the defendant.[8] The defendant argues that the probative value of this testimony was questionable in light of testimony from Kurt Stenn, the physician who performed the autopsy, that he did not know whether some or all of the blood in her body was transfused blood, and that such blood could have come from a donor with controlled substances in his or her system. This testimony, however, does not affect the relevance of Pinder's testimony; it goes rather to the weight the jury will accord the state's evidence. See *Emhart Industries, Inc.* v. *Amalgamated*

---

[8] We note that the testimony of Pinder with respect to the presence of two other drugs, Tofranil and Norpramine, in Gorman's blood was not entirely relevant to the state's case; however, the admission of such testimony was not prejudicial to the defendant. The defendant had testified earlier in the trial that Gorman had had various medical problems, and had been taking various medications. Therefore, Pinder's testimony was merely cumulative.

*Local Union 376, U.A.W.,* 190 Conn. 371, 404, 461 A.2d 422 (1983); *Angelica* v. *Fernandes,* 174 Conn. 534, 535, 391 A.2d 167 (1978).

The defendant also argues that it was error to allow into evidence two prescription bottles and syringes found at the scene of the accident in which Gorman was killed. This evidence was cumulative of prior testimony concerning the type of drug prescribed to Gorman and the method of taking it, and it tended to corroborate testimony that the defendant had prescribed Demerol to Gorman, after Taub had requested him to discontinue prescribing the medication, a fact which, if believed, tended to support the state's theory that the defendant had not acted in good faith and in the proper course of his professional practice.

We cannot conclude, therefore, that the trial court abused its discretion in ruling that the testimony concerning the results of the autopsy, and the prescription bottles, were relevant and that their probative value outweighed any possible prejudicial effect. *State* v. *Sharpe,* supra, 660; see *State* v. *Paoletto,* 181 Conn. 172, 184–86, 434 A.2d 954 (1980).

The introduction of testimony concerning the circumstances of Gorman's accident, however, presents a different situation. Officer Niezgorski of the Meriden police department testified that Gorman had died in a one car accident, which occurred on a sunny day and on a relatively straight road. In addition, he testified that there were no skidmarks at the accident scene, and that a mechanic's inspection of her car revealed no mechanical defects. Even if we were to agree that this testimony was relevant to the state's case against the defendant, we must conclude that its prejudicial effect far outweighs its probative value.

In *State* v. *Mastropetre,* supra, 517, we indicated that "evidence which is inconsequential tending to distract

attention from the real issue should be excluded . . . as should evidence which would be of greater prejudicial effect than probative value." (Citations omitted.) See also *State* v. *Johnson,* 190 Conn. 541, 551, 461 A.2d 981 (1983). Applying this reasoning, we conclude that the testimony of Niezgorski concerning details of the accident should have been excluded. His testimony would almost certainly have distracted the jury from the real issue in the case, that is whether the defendant's care and treatment of Gorman was in violation of General Statutes §§ 21a-277 (a) and 21a-252 (a), and would have shifted the focus, to the defendant's prejudice, to whether he was responsible for her death. While Gorman's absence from the trial required some explanation, it was sufficient for the jury to know that Gorman had died in an automobile accident, information which had already come to the jury's attention through the testimony of Gorman's sister. We conclude, therefore, that the trial court abused its discretion in admitting the details of Gorman's accident.

## III

The defendant next claims that the trial court erred in denying his motion to dismiss the information on the ground that the issues in the criminal case had been fully and finally litigated in the defendant's favor in a proceeding before the commissioner of consumer protection, and, therefore, the state was collaterally estopped from prosecuting him. We find no error in the trial court's denial of the defendant's motion.

Initially, we must note that the state claims that, because the defendant characterized his motion to dismiss as one based on double jeopardy rather than on res judicata or collateral estoppel, he must be deemed to have waived his right to raise either of these defenses on appeal. See Practice Book §§ 808, 810.[9] We disagree.

---

[9] "[Practice Book] Sec. 808. ——MATTERS TO BE RAISED BY MOTION

"Any defense, objection or request capable of determination without a

Although the defendant did not specifically use the term collateral estoppel in his motion, or during argument on his motion, it is clear from a review of the transcript that this was the essence of his argument, i.e., the effect of the administrative proceeding on the state's ability to go forward with a criminal proceeding against the defendant. Furthermore, the United States Supreme Court has indicated that the principle of collateral estoppel is embodied in the double jeopardy clause of the fifth amendment, which applies to the states through the fourteenth amendment. *Ashe* v. *Swensen*, 397 U.S. 436, 445–47, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970). Because we conclude that this issue was raised sufficiently at trial, we will review the merits of the defendant's claim.

The commissioner of the department of consumer protection charged the defendant with improperly and illegally prescribing Demerol and Dolophine for Barbara Gorman. Adjudicative hearings were held during which the department had a full opportunity to put on evidence and present testimony in support of its complaint. The hearing officer concluded that the agency had failed to prove the allegations in its complaint and recommended that the defendant's license not be suspended or revoked. Pursuant to this report, the commissioner dismissed the agency's complaint. The defendant claims that because the charges against him were fully litigated to a final conclusion in these administrative proceed-

trial of the general issue may be raised only by a pretrial motion made in conformity with this chapter."

"Sec. 810. ——FAILURE TO RAISE DEFENSE, OBJECTION OR REQUEST

"Failure by a party, at or within the time provided by these rules, to raise defenses or objections or to make requests that must be made prior to trial shall constitute a waiver thereof, but a judicial authority, for good cause shown, may grant relief from such waiver, provided, however, that lack of jurisdiction over the offense charged or failure of the indictment or information to charge an offense may be raised by the defendant or noticed by the judicial authority at any time during the pendency of the proceedings."

ings, the state is collaterally estopped from prosecuting him for violating General Statutes §§ 21a-277 (a) and 21a-252 (a). We disagree.

"Collateral estoppel is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice." *Ashe* v. *Swensen,* supra, 443. It is " 'that aspect of the doctrine of res judicata which serves to estop the relitigation by parties and their privies of any right, fact or legal matter which is put in issue and has been once determined by a valid and final judgment of a court of competent jurisdiction.' *State* v. *Wilson,* 180 Conn. 481, 485, 429 A.2d 931 (1980)." *P.X. Restaurant, Inc.* v. *Windsor,* 189 Conn. 153, 161, 454 A.2d 1258 (1983); *Slattery* v. *Maykut,* 176 Conn. 147, 157, 405 A.2d 76 (1978); 1 Restatement (Second), Judgments § 27 (1982). In principle, the doctrine of collateral estoppel applies to criminal as well as civil proceedings. See *State* v. *Aillon,* 189 Conn. 416, 424, 456 A.2d 279, cert. denied, 464 U.S. 837, 104 S. Ct. 124, 78 L. Ed. 2d 122 (1983); *State* v. *Wilson,* supra, 486; see also *State* v. *Ellis,* 197 Conn. 436, 464–65, 497 A.2d 974 (1985). We have held that the doctrine may also apply to determinations of administrative agencies under certain circumstances. See *Corey* v. *Avco-Lycoming Division,* 163 Conn. 309, 318, 307 A.2d 155 (1972), cert. denied, 409 U.S. 1116, 93 S. Ct. 903, 34 L. Ed. 2d 699 (1973); see also *United States* v. *Utah Construction & Mining Co.,* 384 U.S. 394, 421, 86 S. Ct. 1545, 16 L. Ed. 2d 642 (1965); 2 Am. Jur. 2d, Administrative Law § 496. This is the first opportunity, however, that we have had to consider whether collateral estoppel operates to bar relitigation in a state criminal proceeding of those issues previously decided by a state administrative agency. See annot., 30 A.L.R. 4th § 856.

The state does not dispute that the issues raised before the administrative agency were substantially the

same as those raised in the criminal prosecution of the defendant. Rather, it argues that the doctrine of collateral estoppel is not applicable to the criminal proceedings against the defendant because there is no privity between the state's attorney's office within the division of criminal justice and the department of consumer protection. The defendant argues, however, that, since the commissioner of consumer protection and the state's attorney are both agents of the state and are both charged with protecting the consumer, privity exists for purposes of collateral estoppel. We are unpersuaded by the defendant's argument.

"Privity is not established . . . from the mere fact that persons may happen to be interested in the same question or in proving or disproving the same facts." 46 Am. Jur. 2d, Judgments § 532. While the concept of privity is difficult to define precisely, it has been held that "a key consideration for its existence is the sharing of the same legal right by the parties allegedly in privity." *BTC Leasing, Inc.* v. *Martin,* 685 S.W.2d 191, 198 (Ky. App. 1984). This is to ensure that the interests of the party against whom collateral estoppel is being asserted have been adequately represented because of his purported privity with a party at the initial proceeding. See *BTC Leasing, Inc.* v. *Martin,* supra; 46 Am. Jur. 2d, Judgments § 532; see also *Sunshine Coal Co.* v. *Adkins,* 310 U.S. 381, 402, 60 S. Ct. 907, 84 L. Ed. 1263 (1940); *Safir* v. *Gibson,* 432 F.2d 137, 142 (2d Cir. 1970); *Wade's Dairy, Inc.* v. *Fairfield,* 181 Conn. 556, 561, 436 A.2d 24 (1980).[10]

---

[10] The defendant's reliance on *Sunshine Coal Co.* v. *Adkins,* 310 U.S. 381, 60 S. Ct. 907, 84 L. Ed. 1263 (1940), for the proposition that privity exists between the state's attorney and the department of consumer protection is misplaced. Although the court indicated that privity might exist between officers of the same government, it pointed out that "the crucial point is whether or not in the earlier litigation the representative of the United States had authority to represent its interests in a final adjudication of the controversy." Id., 403. Such was not the case here.

Applying this analysis to the present case compels the conclusion that the department of consumer protection is not in privity with the division of criminal justice. The department of consumer protection is granted the authority to investigate, inter alia, licensing complaints; General Statutes § 21a-8 (4), (6) and (8);[11] which was obviously its function in this instance,

---

[11] "[General Statutes] Sec. 21a-8. (Formerly Sec. 19-171g). DEPARTMENT OF CONSUMER PROTECTION'S POWERS AND DUTIES RE BOARDS AND COMMISSIONS. The department of consumer protection shall have the following powers and duties, with regard to each board or commission transferred to the department of consumer protection under section 21a-6:

\* \* \*

"(4) The department shall conduct any necessary review, inspection or investigation regarding qualifications of applicants for licenses or certificates, possible violations of statutes or regulations, accreditation of schools, disciplinary matters and the establishment of regulatory policy, and make recommendations to the appropriate board or commission. In connection with any investigation, the commissioner of consumer protection or the commissioner's authorized agent may administer oaths, issue subpoenas, compel testimony and order the production of books, records and documents. If any person refuses to appear, to testify or to produce any book, record or document when so ordered, a judge of the superior court may make such order as may be appropriate to aid in the enforcement of this section.

\* \* \*

"(6) The department shall conduct any necessary investigation and follow-up in connection with complaints regarding persons subject to regulation or licensing by the board or commission.

\* \* \*

"(8) The department shall receive complaints concerning the work and practices of persons licensed, registered or certified by such boards or commissions and shall receive complaints concerning unauthorized work and practice by persons not licensed, registered or certified by such boards or commissions. The department shall distribute monthly a list of all complaints received within the previous month to the chairperson of the appropriate board or commission. The department shall screen all complaints and dismiss any in which the allegation, if substantiated, would not constitute a violation of any statute or regulation. The department shall distribute notice of all such dismissals monthly to the chairperson of the appropriate board or commission. The department shall investigate any complaint in which the allegation, if substantiated, would constitute a violation of a statute or regulation under its jurisdiction. In conducting the investigation, the commissioner may seek the assistance of a member of the appropriate board,

and, if such complaints have validity, to take proper action against the practitioner, which may consist of, inter alia, the revocation or suspension of a license, the imposition of a probationary period or reprimand. General Statutes § 21a-7 (7).[12] The state's attorneys within Connecticut, however, "exercise all powers and duties with respect to the investigation and prosecution of

an employee of any state agency with expertise in the area, or if no such member or employee is available, a person from outside state service licensed to perform the work involved in the complaint. Board or commission members involved in an investigation shall not participate in disciplinary proceedings resulting from such investigation. The commissioner of consumer protection may dismiss a complaint following an investigation if he determines that such complaint lacks probable cause. Notice of such dismissal shall be given only after approval by the chairperson of the appropriate board or commission. The commissioner may authorize a settlement if the settlement is approved by the complainant, the practitioner, and the board or commission. The commissioner may bring a complaint before the appropriate board or commission for a formal hearing if he determines that there is probable cause to believe that the offense alleged in the complaint has been committed and that the practitioner named in the complaint was responsible. All dispositions and final decisions by the department of consumer protection after an investigation into a complaint has begun shall be forwarded to the chairperson of the appropriate board or commission on a monthly basis."

[12] "[General Statutes] Sec. 21a-7. (Formerly Sec. 19-171f). POWERS AND DUTIES OF BOARDS AND COMMISSIONS WITHIN DEPARTMENT OF CONSUMER PROTECTION. Each board or commission transferred to the department of consumer protection under section 21a-6 shall have the following powers and duties:

\* \* \*

"(7) In addition to any other action permitted under the general statutes, each board or commission may upon a finding of any cause specified in subsection (c) of section 21a-9; Revoke or suspend a license, registration or certificate; issue a letter reprimand to a practitioner and send a copy of such letter to a complainant or to a state or local official; place a practitioner on probationary status and require the practitioner to report regularly to the board or commission on the matter which is the basis for probation, limit his practice to areas prescribed by the board or commission or, to continue or renew his education until he has attained a satisfactory level of competence in any area which is the basis for probation. Each board or commission may discontinue, suspend or rescind any action taken under this subsection."

criminal matters." General Statutes § 51-277 (a);[13] see also General Statutes § 51-286a. The purpose of the administrative proceedings, therefore, is to police licensing requirements within the state, while the state's attorney's interest in the criminal proceeding is in having guilt or innocence determined under the applicable criminal law and in seeing that proper punishment is meted out in the event that the criminal law has been violated. The "state's attorney represents the broader public interest in the effective administration of criminal justice. *State* v. *Moynahan,* 164 Conn. 560, 568, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973)." *State* v. *Ellis,* supra, 470; see *People* v. *Demery,* 104 Cal. App. 3d 548, 163 Cal. Rptr. 814 (1980); *Keating* v. *Department of Natural Resources,* 140 Ga. App. 796, 232 S.E.2d 84 (1976), aff'd, 238 Ga. 605, 234 S.E.2d 519 (1977); *Younge* v. *Board of Registration,* 451 S.W.2d 346 (Mo. 1969), cert. denied, 397 U.S. 922, 90 S. Ct. 910, 25 L. Ed. 2d 102 (1970); *People* v. *Morgan,* 111 App. Div. 2d 771, 490 N.Y.S.2d 30 (1985); *People* v. *Lalka,* 113 Misc. 2d 474, 449 N.Y.S.2d 579 (1982); see generally annot., 30 A.L.R.4th § 856; cf. *State* v. *Cox,* 352 So. 2d 638 (La. 1977); *People* v. *Klein,* 76 App. Div. 2d 913, 429 N.Y.S.2d 39 (1980); but see *People* v. *Sims,* 32 Cal. 3d 468, 651 P.2d 321, 186 Cal. Rptr. 77 (1982); *District of Columbia* v. *Fisher,* 258 A.2d 456 (D.C. App. 1969). We conclude, therefore, that the state's interest in having guilt or innocence determined is not adequately served in an administrative proceeding because, as the state points out in its brief, the state's attorney has no control over the timing, substance or litigation

---

[13] "[General Statutes] Sec. 51-277. POWERS AND DUTIES OF DIVISION. (a) The division shall exercise all powers and duties with respect to the investigation and prosecution of criminal matters conferred upon or required of it by this chapter, or conferred upon or required of state's attorneys, assistant state's attorneys and deputy assistant state's attorneys of the superior court by the common and statutory law of this state."

of charges lodged against the defendant by the department of consumer protection. Therefore, since no privity exists, the state is not collaterally estopped from prosecuting the defendant. Accordingly, the trial court did not err in denying the defendant's motion to dismiss.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other justices concurred.